IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

HOWARD E. MCCORMICK,
Plaintiff,

v.  CIVIL ACTION NO. 1:04CV207

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross Motions for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

## I. Procedural History

Howard E. McCormick ("Plaintiff") filed his application for DIB on December 1, 2000, alleging disability as of June 5, 1998, due to injuries to his left arm, shoulder, neck, and hand, and right shoulder and ankle (R. 73, 93). The application was denied initially and on reconsideration (R. 57, 64). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Steven Slahta held on April 17, 2002 (R. 283). Plaintiff, represented by counsel, testified along with Vocational Expert Tim Mahler ("VE"). The ALJ rendered a decision on August 30, 2002, finding that Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (R. 23). The Appeals Council denied Plaintiff's request for review, making the ALJ's

decision the final decision of the Commissioner (R. 4).[1]

## II. Statement of Facts

Plaintiff was born on March 4, 1959, and was 53 years old on the date of the ALJ's decision (R. 73). He completed the eighth grade and obtained a GED (R. 287). He worked as a hydraulic repair mechanic (R. 287). He last worked on November 3, 1997, with a two-month unsuccessful attempt at work in 1998. The ALJ found he had not engaged in substantial gainful employment since November 3, 1997 (R. 14).

The following facts are taken from a prior ALJ decision dated October 25, 1999. In 1989, Plaintiff slipped off a wrecker he was repairing at Fort Bragg, while on Army Reserve duty. He jumped off the truck, catching his wedding ring on the truck bed, traumatically partially amputating his left ring finger (R. 200). In addition to the amputation, Plaintiff suffered injuries to his left arm, left shoulder, and neck. He continued to work and suffered damage to his right shoulder by overusing his right arm while compensating for the damage to his left. Plaintiff was discharged from the service on January 29, 1990, because his "medical condition prevent[ed] satisfactory performance of duty in [his] grade and primary MOS." He was rated a 20% disability by the Veterans Administration ("VA")(R. 37).

Plaintiff has been diagnosed with degenerative joint disease in the cervical spine (R. 37). A cervical epidural reportedly gave Plaintiff relief for only a couple of days (R. 38).

Plaintiff had bilateral release of impingement syndrome with the left shoulder in November 1992, and the right shoulder in August 1991.

---

[1]Plaintiff was awarded benefits based on a subsequent application, with an onset date of September 2003 (R. 4). This onset date was apparently based on Plaintiff's RFC plus his age, which was six months short of 55, considered "a person of advanced age" by the Commissioner.

2

Plaintiff had EMG testing in January 1996, which was interpreted as negative for acute radiculopathy, peripheral neuropathy or any acute nerve entrapment. There was mild cervical stenosis at C5-6 with osteophyte formation, and some mild bilateral neural foraminal narrowing as shown by an MRI in 1996. Plaintiff was having muscle spasms in his neck and left forearm. A later MRI of the Plaintiff's cervical spine on June 16, 1998, showed a minimal central disc protrusion at C6-7 and a left central disc protrusion at C5-6, impinging upon the left C5-6 neural foram. His cervical spine otherwise appeared normal.

Plaintiff reported his left shoulder began bothering him again in December 1997 (Id.). Dr. Eric Jones ordered an MRI of the left shoulder which was performed on December 28, 1997. It revealed slight impingement of the rotator cuff by degenerative changes in the AC joint. There was no rotator cuff tear.

Plaintiff is also status post left carpal tunnel release. Plaintiff was also having some ulnar nerve symptoms as well as some median nerve symptoms at the wrists, but he was getting better as of September 11, 1998, and was tolerating things with very little in the way of pain medication. On his next visit in December 1998, it was noted that his arm pain was pretty much resolved and he was making progress with therapy (Id.)

Imaging of Plaintiff's hand revealed no abnormality other than the partial amputation of the fourth finger. There were no degenerative changes in the hand or wrist.

When Plaintiff was seen in May 1998 at the VA facility, he was complaining of grinding and catching in his left shoulder, could not do work over his head, and had a permanent restriction of the range of motion in his left shoulder. The VA doctor diagnosed ulnar sensory neuropathy/costalgia, clinically; post amputation of the left ring (fourth) finger; arthropathy of the left shoulder, status post

3

surgery; and cervical mild cystitis with a history of cervical disc disease. Plaintiff also exhibited some restriction in the range of motion of his neck which was "predominantly mild specific in origin." Flare-ups of his shoulder condition were linked to lifting anything heavy or walking with his arm hanging down. Plaintiff demonstrated full range of motion with his left hand. The VA doctor opined Plaintiff's left arm symptoms were keeping him from doing substantial gainful activity.

Plaintiff attended physical therapy off and on for several years, the last time from May 1999 through May 2000 (R. 123). In June 1999, Dr. Jones wrote that Plaintiff complained of having three to four spasms per week and headaches associated with his cervical disk disease (R. 165). He was continuing to work, although he was having trouble with pain down his left arm most of the time. Therapy did not seem to be making a lot of difference, but Dr. Jones thought that "a combination of therapy, work, and whatever else he could do [was] probably fine to try to continue."

The previous ALJ decision was entered on October 25, 1999 (R. 45).

On December 3, 1999, Dr. Jones noted that Plaintiff was still mostly just working on disability problems and was about the same as far as doing things. He was still having neck problems and headaches. His exam was "really still unremarkable other than some loss of motion of rotation, tilt, etc." (R. 165).

On February 14, 2000, the VA determined Plaintiff had a combined disability of 70% due to headaches and "individual unemployability" (R. 88).

In March 2000, Dr. Jones noted Plaintiff was about the same (R. 162). Neck motion was "still a little restricted." He was still having headaches, which were "probably the biggest problem." Dr. Jones referred him to a neurologist for the headaches.

On May 17, 2000, Dr. Jones noted Plaintiff still had "occasional" pain in his shoulders. He had full range of motion of both shoulders, however.

Plaintiff was released from physical therapy after approximately one year, in April 2000 (R. 123). He was discharged secondary to obtaining maximum benefit as well as his independence with a home exercise program. Upon his discharge he reportedly continued to have complaints of cervical discomfort with symptoms radiating into the left shoulder and left upper extremity. Continued periodic headaches were also noted. He continued to report increased symptoms as his activity level increased.

In June 2000, Dr. Jones reported Plaintiff did not have much change (R. 162). His motion was still restricted, particularly rotation and tilt, but overall things were just about the same with cervical and thoracic discomfort.

On October 6, 2000, Plaintiff was still doing about the same (R. 162). He continued to have headaches, neck pain, and shoulder pain.

On January 18, 2001, State agency reviewing physician Hugh M. Brown, M.D., completed a Physical RFC assessment based on chronic cervical-lumbar strain, determining Plaintiff could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, and sit and stand/walk about 6 hours in an eight-hour workday (R. 147-148). He opined Plaintiff had no postural limitations, no manipulative limitations, and no environmental limitations. He reduced Plaintiff's exertional level to medium based on the degree of subjective pain and the objective findings. He also considered the 1999 ALJ decision that Plaintiff was limited to light work, and found the current medical evidence showed this was no longer supported, and that Plaintiff should be able to perform full medium work activity.

In February 2001, Plaintiff reported his headaches had improved greatly with the new medications. He had only one or two headaches per week, and these were controlled with aspirin. His neck pain was also improving. He had no adverse reaction to the medications except for occasional stomach upset which he controlled by taking Tums. He was diagnosed with chronic tension headache with good response to medications.

In April 2001, Plaintiff returned to Dr. Jones for a follow up of his neck problems (R. 161). He was using a TENS unit and a heated cervical collar, and Dr. Jones noted "it sounds like that's helping some." Otherwise Plaintiff appeared to be doing about the same.

On October 3, 2001, Dr. Jones again noted that Plaintiff was doing "about the same" (R. 230). His cervical spine range of motion was "still significantly restricted," with less than 45 degrees of rotation, less than 10 degrees of tilt, and less than 30 degrees of flexion and extension. Strength, sensation, and reflexes were all normal.

On January 24, 2002, Plaintiff underwent an MRI of the cervical spine at the VA (R. 250). It indicated a broad-based posterior disk bulge at C5-6 and C6-7 with moderate neural foraminal stenosis at those levels. There was a right-sided posterolateral osteophyte at C4-5. The findings were grossly comparable to those seen on the previous study of December 1996, except for some slight increase in the amount of stenosis at C5-6 and C6-7.

On March 11, 2002, Dr. Kurth wrote that Plaintiff returned to the office "for a check up stating that he's after Social Security Disability again" (R. 263). There was no real impingement in the shoulder, but there was still some weakness. Dr. Kurth found no change from previous exams.

On March 26, 2002, Plaintiff's doctor at the VA noted that upon physical exam, range of motion of the neck was severely limited. He had only about 10% of rotation in either direction

which was subjectively limited by pain. He could not touch his chin to his chest, nor could he extend his neck much more than 10 degrees. Physical exam of the upper extremities revealed moderately positive Hawkins and Near test of the left shoulder, indicating shoulder impingement. An MRI indicated some mild stenosis primarily from disc bulge and osteophytes at C4-5 and C5-6.

The VA doctor discussed with Plaintiff jobs that he could possibly do, but also noted that a lot of the jobs required neck flexion or extension "which he is unable to do." Also, he opined Plaintiff could not do any lifting, or any job that required neck flexion or extension or reaching.

On April 3, 2002, Dr. Kurth noted that he was "still trying to get [Plaintiff] through his disability hearings" (R. 262). Plaintiff was continuing to "have trouble with his neck with activities." His range of motion continued to be diminished. He continued to have some left upper extremity radiation of his discomfort and numbness but overall was working on a home exercise program for this, which the doctor thought was "probably adequate for his neck."

At the administrative hearing held in April 2002, the ALJ asked the VE if there would be any jobs available for an individual of Plaintiff's age, experience, and education at the light exertional level with a sit-stand option, no overhead reaching, and low stress ("defined as one and two-step processes, routine and repetitive tasks, primarily working with things rather than people, entry level.") (R. 311). The ALJ responded that the individual could perform the work of inspector checker, with 800 jobs locally and 40,000 nationally, and packing and filling machine tender, with 400 jobs locally and 150,000 nationally.

The ALJ asked if any of the jobs would require neck extension or flexion, and the VE replied that the inspector checker job would require looking down at all times while the packing and filling machine tender would require rotation in the neck to look sideways (R. 312).

Plaintiff's counsel asked the VE if the two jobs named would be eliminated if the individual had the bimanual dexterity problems to which Plaintiff testified (R. 313). The VE responded:

> With the inspector checkers these are jobs basically that you could perform with one hand. It would be difficulty [sic] but if you could use [the] non-dominant hand for help, you could still maintain it if that's the only thing you're dealing with besides everything else. The packer, the packing and filling machine tender basically you're allowing the machine to do the work and your function is to watch the machine do the work and your function is to watch the machine, stop it when there's a jam, and unjam it. So, you could still do that with one, if it's your dominant hand.

(R. 313). He also testified that it would be "feasible" for the individual to keep up pace and productivity with one hand in the "machine job," but it would be "difficult" with the inspector checker job (R. 314).

Subsequent to the hearing, the ALJ sent Plaintiff for both psychiatric and physical examinations.[2] He was examined physically by Kip Beard, M.D. (R. 272). Examination of the cervical spine revealed pain with range of motion testing and reports by Plaintiff of, "that's it." On extremes of motion testing there was paravertebral and spinous process tenderness without spasm. Neck flexion appeared limited to 30 degrees, extension to 25 degrees, lateral bending to 25 degrees, and rotation to fifty degrees right and 45 degrees left. Plaintiff also had bilateral shoulder pain and tenderness. There was shoulder and neck pain on range of motion testing. Both shoulders appeared limited. Flexion and extension of the elbows and wrists were normal.

Plaintiff could button and pick up coins. He could make a fist. Grip strength was reduced, however, particularly on the left. There was diminished light touch suggesting median nerve distribution in the left hand and ulnar nerve distribution on the right. Tinel's was mildly positive at

---

[2]There is no issue raised regarding the ALJ's treatment of the alleged mental impairments. The undersigned therefore does not discuss the evaluation or treatment of Plaintiff's alleged mental impairments.

both wrists and the left elbow. There was some deltoid atrophy, right greater than left. There was no focal weakness.

Dr. Beard's impression was chronic neck pain–chronic cervical strain superimposed upon cervical spondylosis and degenerative disc disease and MRI showing disc protrusion/herniation with some neuroforaminal stenosis; status post bilateral shoulder surgery with history of rotator cuff tendinitis/tear and possible subacromial bursitis and osteoarthritis; chronic left ankle sprain; chest pain, atypical for angina; left carpal tunnel syndrome; and possible right ulnar neuropathy. Grip strength was mildly diminished on the left. Fine manipulation appeared well preserved.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b) with a history of remote traumatic injury including partial amputation of the left ring finger, neck injury and torn left rotator cuff; periodic headaches and neck pain; cervical spine problems, a history of left carpal tunnel release and bilateral shoulder release. The claimant also has non-severe impairments with mild cortical brain atrophy, hepatitis A, mild heart irregularity with apical thinning, adjustment disorder, Posttraumatic stress disorder (PTSD), hypertension, colon polyps with abdominal discomfort, hiatal hernia and gastroesophageal reflux disease (GERD).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 as discussed in the body of this decision.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7. The claimant has the residual functional capacity for a light exertional level work with no with a sit-stand option and no overhead reaching [sic]. Additionally, the work must be unskilled low stress routine work with things, not people, at the entry level. (SSR 96-5p).

8. The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9. The claimant is an "individual closely approaching advanced age" (20 CFR § 404.1563).

10. The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

11. The claimant has no transferable skills from any past relevant work and transferability of skills is not an issue in this case (20 CFR § 404.1568).

12. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

13. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.14 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work [sic] are set forth in the body of this decision consistent with the vocational expert testimony and the DICTIONARY OF OCCUPATIONAL TITLES.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f)).

(R. 22-23).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The ALJ erred in failing to address the findings of the prior ALJ decision and the prior RFC assessment as required by AR 00-1(4), thereby making his current RFC assessment unsupported by substantial evidence;

2. The ALJ improperly ordered post-hearing consultative examinations; and

3. The ALJ's RFC is not supported by substantial evidence.

Defendant contends:

1. The ALJ acknowledged the earlier decision in his current decision;

2. The regulations give adjudicators the option of referring a claimant for a consultative examination when the adjudicator determines that the evidence as a whole, both medical and non-medical, is insufficient to support a decision on a claim; the ALJ here found the treatment records did not fully substantiate some of Plaintiff's claims.

3. The record supports the ALJ's RFC finding.

### C. Prior ALJ Decision

Plaintiff first argues: "The ALJ erred in failing to address the findings of the prior ALJ decision and the prior RFC assessment as required by AR 00-1(4), thereby making his current RFC assessment unsupported by substantial evidence." Defendant argues the ALJ acknowledged the earlier decision in his current decision. The undersigned notes both decisions were made by the same ALJ, Steven D. Slahta.

AR 00-1(4) applies only to disability findings in cases involving claimants who reside in the Fourth Circuit at the time of the determination or decision. "It applies only to a finding of a claimant's [RFC] . . . which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim." In the present case the earlier RFC finding was made in a final decision by the ALJ, and concerned a claimant residing in the Fourth Circuit. The Ruling therefore applies to this matter. The Ruling continues:

> When adjudicating a subsequent disability claim . . ., an adjudicator determining

> whether a claimant is disabled during a previously unadjudicated period <u>must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances</u>. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

(Emphasis added).

In his decision dated October 25, 1999, ALJ Slahta found that Plaintiff had the following Residual Functional Capacity ("RFC"):

> The claimant has the residual functional capacity to do a limited range of light exertional level work. He requires work with a sit/stand option, no exposure to hazards such as dangerous moving machinery or unprotected heights, no fine manipulation with his non-dominant left hand, no gross grasping strength, and no repetitive overhead reaching.

(R. 44). In his August 30, 2002, decision, ALJ Slahta found:

> The claimant has the residual functional capacity for a light exertional level work with no with a sit-stand option and no overhead reaching [sic]. Additionally, the work must be unskilled low stress routine work with things, not people, at the entry level.

(R. 22). There are two significant differences between the two RFC's – the latter one does not provide for any limitations regarding work hazards or any limitations on fine manipulation or gross grasping strength with the left hand. Nor does the ALJ explain these omissions.

Defendant argues the ALJ "acknowledged his October 1999 decision in his current decision (Tr. 12)." Defendant also argues that the ALJ found Plaintiff's current condition did not result in bi-manual dexterity problems, and Defendant concludes that the ALJ "implicitly addressed the

manipulative limitation difference in his decisions and Plaintiff's AR 00-1(4) argument is without merit." The undersigned does not agree, and finds the ALJ's decision does not comport with the Ruling.[3]

The ALJ found Plaintiff apparently no longer had fine manipulation or grasping limitations and no longer needed to avoid workplace hazards. The ALJ may, in fact, be correct; however, he did not discuss the prior RFC or why it had changed, as required by the Ruling. The undersigned cannot find this omission to be simply harmless error, because the original injury that allegedly caused Plaintiff to quit working was the loss of his left ring finger in a traumatic accident that also undisputedly caused hand, shoulder, and neck injuries. The alleged manipulative impairment is therefore relevant at least supported by objective evidence.

In addition, the ALJ omitted the limitation regarding avoiding workplace hazards, which was contained in the earlier RFC. The undersigned does not know upon what evidence that original limitation was based, or why it is no longer necessary. Thus the need for explanation under AR 00-1(4). Notably, the consultative examiner, Dr. Beard, expressly found Plaintiff should avoid workplace hazards due to his orthopedic conditions (R. 281).

The undersigned therefore finds the ALJ erred by failing to discuss the prior RFC, in particular the limitations on fine manipulation and grasping and avoiding hazards. By this finding, the undersigned does not express an opinion on whether Plaintiff currently has such limitations. The ALJ is, however, required to "consider [the prior RFC assessment] as evidence and give it appropriate weight in light of all relevant facts and circumstances," as directed by AR 00-1(4).

---

[3] Although Acquiescence Rulings do not carry the force of law, they are binding on all components of the social Security Administration. 20 CFR § 402.35(b)(2).

### D. Post-Hearing Consultative Examinations

Plaintiff next argues that the ALJ improperly ordered post-hearing consultative examinations. Defendant argues: "The regulations give adjudicators the option of referring a claimant for a consultative examination when the adjudicator determinates that the evidence as a whole, both medical and non-medical, is insufficient to support a decision on a claim" and the ALJ here found the treatment records did not fully substantiate some of Plaintiff's claims.

The undersigned notes this may be the first time he has been asked to find an ALJ erred by <u>referring</u> a claimant for a consultative examination. The vast majority, if not all the arguments reviewed by the undersigned regarding consultative examinations have concerned the ALJ's <u>failure</u> to purchase just such a consultative examination. The undersigned therefore admits to some concern about restricting the ALJ's procuring of evidence. Certainly the ALJ cannot give greater weight to the consultative examiner's opinion than to the treating physician's opinion without a full explanation. However, "the Commissioner 'has broad latitude in ordering a consultative examination." Reed v. Massanari, 270 F.3d 838 (9th Cir. 2000) (quoting Diaz v. Secretary, 898 F.2d 774, 778 (10th Cir. 1990). The Ninth Circuit continued:

> Some kinds of cases, however, do "normally require a consultative examination," including those in which "additional evidence needed is not contained in the records of [the claimant's] medical sources," and those involving an "ambiguity or insufficiency in the evidence [that] must be resolved." *Id.* at §§ 404.1519a(b)(1), (4), 416.919a(b)(1), (4); *see also Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997)("[A] consultative examination is often required for proper resolution of a disability claim."); *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996)("An ALJ must order a consultative evaluation when such an evaluation is necessary to enable the ALJ to make the disability determination."); *Carillo Marin v. Sec'y of Health and Human Servs.*, 758 F.2d 14, 17 (1st Cir. 1985)("[I]f the Secretary is doubtful as to the severity of [a claimant's] disorder the appropriate course is to request a consultative evaluation . . . . The failure to do so in this instance constitutes the requisite 'good cause' for remand . . . .").

15

Id. at 842. The undersigned finds the ALJ's referral of Plaintiff for consultative psychological and physical examinations is not reversible error. In fact, the undersigned finds the ALJ erred by not fully explaining his treatment of the consulting examiner's findings.

### E. RFC

Plaintiff next argues the ALJ's RFC is not supported by substantial evidence. Defendant argues the record supports the ALJ's RFC finding. Because the undersigned has already found the ALJ erred by not considering the prior RFC as substantial evidence, it follows that his current RFC is not supported by substantial evidence. Additionally, the undersigned notes the ALJ did not state what weight he accorded consultative examiner Dr. Beard's opinion, but it appears from the decision that he accorded it great weight. Dr. Beard opined that Plaintiff would have environmental limitations including the need to avoid temperature extremes, vibration, humidity/wetness, and hazards; manipulative limitations including feeling with his left hand and reaching in all directions; limitations on pushing and pulling in the upper extremities; and could never climb ladders or ropes, could frequently climb ramps or stairs and could occasionally climb scaffolds (R. 279-280). Despite apparently according Dr. Beard's opinion great weight, the ALJ did not mention any of these limitations in his RFC or in his hypothetical to the VE. The undersigned finds this inconsistency requires explanation by the ALJ.

For all the above reasons the undersigned finds substantial evidence does not support the ALJ's RFC or his determination that Plaintiff was not disabled at any time through the date of the decision.

### VI. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary

Judgment be **DENIED**, and Plaintiff's Motion for Summary Judgment be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable W. Craig Broadwater, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 10th day of October, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

17